# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AMANDA KAISER,<br><br>       Plaintiff,<br><br>v.<br><br>ACCO MANAGEMENT COMPANY, LLC,<br><br>       Defendant. | Case No. 23-CV-1539-JPS<br><br>**ORDER** |

   Plaintiff Amanda Kaiser ("Kaiser" or "Plaintiff") sues Defendant Acco Management Company ("ACCO" or "Defendant") for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). ECF No. 1. Before the Court is Defendant's motion for summary judgment. ECF No. 17. The motion is fully briefed, and for the reasons set forth below, will be denied.  ECF Nos. 18, 24, 29. A scheduling order will be entered contemporaneously with this Order.

1. **LEGAL STANDARD**

   Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant.

*Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 2. RELEVANT FACTS[1]

At the outset, the Court notes that the parties severely diverged from the Court's summary judgment protocols. The Pretrial Procedures Order in this case laid out the following:

> The Court ultimately requires that, with any summary judgment motion, the parties submit a single, granular, agreed-upon statement of facts, written in *narrative*, paragraph form, consisting of only material facts and the minimum necessary contextualizing facts. . . . [T]he Court will only consider the single, agreed-upon statement of facts. . . .
>
> To the extent there are factual disputes, the parties must also jointly submit a single, itemized statement of disputed facts, written in *list* form, . . . Itemized disputed facts must be laid out in a single filing which may not exceed three (3) double-spaced pages.
>
> . . . **Any facts about which a party refuses to meet and confer or stipulate without a reasonable basis will be deemed undisputed.**

---

[1]Facts within this section contain citations to the record. To the extent that these facts are referenced elsewhere in the remainder of the Order, citations will be omitted.

ECF No. 10 at 9. Here, instead of filing a comprehensive joint statement of material facts,[2] the parties needlessly quibbled about largely **agreed-upon** facts in five separate filings. ECF Nos. 23, 25, 26, 30, 31. To the extent the parties could not agree upon additional factual context, they were to file a joint statement of disputed facts, rather than submit responses—and even replies to responses—to one another's proposed facts. ECF No. 10 at 9. It is unclear to the Court who was the primary driver of the failure to adhere to the Court's protocols, but the limited evidence before it suggests that Defendant attempted, at least in the first instance, to comply. *See* ECF No. 28-1 at 3 (email from Defendant's counsel to Plaintiff's counsel stating that he hoped to "streamline the[] issues as much as possible by stipulating to [certain] facts").[3] The Court takes the below facts from a combined reading of the **six** statements of facts, responses, and replies; any facts not properly addressed in a response or reply or not supported by evidence are deemed admitted and therefore undisputed.

ACCO is a health employee management company that provides individuals—as relevant here, nurses—to "perform medical services at clients' homes." ECF No. 30 ¶¶ 1 and 4. ACCO hired both salaried nurses and per-visit nurses (hereinafter "Per-Visit Nurses").[4] ECF No. 31 ¶ 2. The

---

[2]The parties did file a joint statement of fact, ECF No. 22, but it contains only two facts.

[3]The Court also notes that this is not the first time that Plaintiff's counsel, Shannon McDonald, has failed to comply with its summary judgment protocols in this way. *See Hansen v. Container Life Cycle Mgmt. LLC*, 24-cv-158-JPS (E.D. Wis. Feb. 6, 2024), ECF Nos. 17, 21, 22. Attorney McDonald should be wary of continuing to disregard these protocols, as it may result in sanctions.

[4]It is the categorization of these nurses—as either employees or independent contractors—that is at issue in the instant motion. While the parties

sole owner of ACCO is Victor Ogbuehi ("Ogbuehi"), who provided a declaration in support of ACCO's motion for summary judgment. *Id.* ¶ 2; *see also* ECF No. 19. Plaintiff was employed with ACCO as its Director of Nursing/Administrator from April 6, 2021 to December 27, 2021. ECF No. 30 ¶ 3; ECF No. 31 ¶ 29. She also provided a declaration in support of her opposition to Defendant's motion for summary judgment. ECF No. 27.

During the relevant years—2020 and 2021—all of the below facts were true about ACCO's nurses. *See* ECF No. 30 ¶ 13. Per-Visit Nurses did not have independent contractor agreements with ACCO. ECF No. 31 ¶ 2. To receive work at ACCO, Per-Visit Nurses would "submit applications to perform visits at patients' homes. Then, if the Per[-]Visit Nurses qualified, ACCO would include them in a pool . . . that ACCO would call when nursing services needed to be performed."[5] ECF No. 30 ¶ 5. The parties dispute exactly how the Per-Visit Nurses received work assignments, with Plaintiff stating they were "assigned" certain clients, ECF No. 31 ¶ 7, and Defendant averring that they would merely "accept[] the offer" to perform certain visits, ECF No. 30 ¶¶ 5, 8. Both parties agree, however, that Per-Visit Nurses had full discretion to accept or decline patient visits. *Id.* ¶ 17. The

---

use different punctuation and capitalization, *compare* ECF No. 30 ¶ 4 *with* ECF No. 31 ¶ 2, they both agree on the title for these nurses as "Per-Visit Nurses."

[5] While Plaintiff entirely contests this fact, her cited evidence merely supports that the pool of nurses ACCO called upon to fulfill its services included both Per-Visit Nurses and other ACCO nurses. *See* ECF No. 26 ¶¶ 1–3, 6–7 (citing ECF No. 27 ¶¶ 3–5, 8–9). None of her other objections have corresponding citations supported by evidence. Accordingly, the Court will deem the quoted material in ECF No. 30 ¶ 5—omitting the suggestion that the pool of nurses consisted purely of Per-Visit Nurses—to be admitted. This approach is further supported by the fact that Defendants later admit that the pool of nurses included Per-Visit and other ACCO nurses. *See* ECF No. 31 ¶ 7; ECF No. 30 ¶ 8 ("ACCO would offer work to the Per[-]Visit Nurses in its pool of available nurses.").

parties dispute, however, whether Per-Visit Nurses were ever penalized for declining patient visits with ACCO or for any other reason. *See* ECF No. 30 ¶¶ 18, 25; ECF No. 31 ¶¶ 15–16, 24.

In their capacity working for ACCO, Per-Visit Nurses would "use[] their own judgment and expertise to provide the patient[s] with monitoring or medical services." ECF No. 30 ¶ 22. The Per-Visit Nurses would "perform[] the medical care ordered by [a] doctor at [a] client's home." *Id.* at ¶¶ 8, 10; *see also* ECF No. 27 ¶ 22. Their services required approval from a medical doctor/insurance company prior to being performed. ECF No. 31 ¶ 21. While on patient visits, Per-Visit Nurses would also independently determine whether the personal care workers caring for patients at the homes they visited were following the care plan properly.[6] ECF No. 30 ¶ 23. Following these patient visits, Per-Visit Nurses would draft and submit paperwork to a ACCO administrator for review; if the Per-Visit Nurse made a mistake on their paperwork, ACCO would direct them to correct it. *Id.* ¶ 24; ECF No. 31 ¶ 23. All these facts applied equally to ACCO's salaried nurses. ECF No. 31 ¶¶ 9, 20, 23.

In addition, both Per-Visit Nurses and salaried nurses: (1) were Registered Nurses ("RNs") "who received their credentials before applying to provide services for ACCO," ECF No. 30 ¶ 6 and ECF No. 31 ¶ 6; (2) did not have their own offices at the primary ACCO office, ECF No. 30 ¶ 14 and ECF No. 31 ¶ 12; (3) primarily worked outside the primary ACCO office, ECF No. 30 ¶ 15 and ECF No. 31 ¶ 13; (4) were not required to wear an

---

[6]While Plaintiff objects to this paragraph in Defendant's statement of proposed facts, she does not provide any objections to this specific statement, nor does she cite any evidence to contradict it. The Court will, thus, deem the paragraph undisputed.

ACCO uniform, ECF No. 30 ¶ 16 and ECF No. 31 ¶ 14; (5) drove their personal vehicles to patient visits and were not compensated for related gas or mileage, ECF No. 30 ¶¶ 19–20 and ECF No. 31 ¶ 17–18; (6) were not supervised on patient visits, ECF No. 30 ¶ 21 and ECF No. 31 ¶ 19; (7) "were required to complete yearly in-service packets and confirm that they had read and understood ACCO's Personal Protective Equipment (PPE) Policy, Handwashing Policy, [and] Employee Handbook," ECF No. 31 ¶ 3; (8) received an employee email address from ACCO, *id.*; and (9) completed an annual checklist to confirm that they had completed all nursing competencies, *id.* ¶ 4. ACCO provided both salaried and Per-Visit Nurses with "supplies to complete skilled visits such as wound care supplies (gauze, dressings, wound wash solution, bandages, ointment, specialty supplies ordered by the doctor)." *Id.* ¶ 5.

There were minor differences in the how ACCO interacted with the Per-Visit vs. salaried nurses. First, if Per-Visit Nurses did not work, they would not be paid. ECF No. 30 ¶ 26. Second, no Per-Visit Nurse worked a consistent full-time schedule for ACCO, while it seems that salaried nurses worked full-time. *Id.* ¶ 27; ECF No. 31 ¶ 2 (comparing salaried nurses with Per-Visit Nurses that worked only part-time);[7] ECF No. 32 ¶ 2 (citing ECF Nos. 20-6, 20-7, and 20-8). For this reason, Per-Visit Nurses did not receive employment benefits from ACCO, while salaried nurses did. ECF No. 30 ¶ 35 and ECF No. 31 ¶ 26 (stating, without objection, that none of ACCO's part-time staff received employment benefits). The Per-Visit Nurses also

---

[7]Because Defendant does not address this portion of the statement in its response, this assertion is deemed undisputed.

"often worked for other [health care] organizations . . . , as ACCO did not offer sufficient work." ECF No. 30 ¶ 34.

ACCO had four Per-Visit Nurses on its payroll in 2020: Mehriban Mamedova, Brandon Miller, Irina Obidine, and Anna Bayramova. ECF No. 30 ¶ 12. The Per-Visit Nurses were "provided W-2 Forms[,] with taxes withheld accordingly." *Id.* ¶ 36. This is also reflected in the Quarterly Contribution Reports that ACCO filed with the State of Wisconsin Department of Unemployment Insurance. ECF No. 31 ¶ 28 (citing ECF No. 20 ¶ 11 and ECF No. 20-2 (showing Per-Visit Nurses listed as "employees" and included in the total employee count)).

The parties neglected to address the specifics of how Per-Visit Nurses were paid in 2020. The parties do not discuss that topic beyond mentioning that Per-Visit Nurses received W-2s but were not paid unless they performed patient home visits within a certain pay period. ECF No. 30 ¶¶ 26, 36; ECF No. 31 ¶ 24. The exhibits are seemingly contradictory. The W-2s received by Per-Visit Nurses seem to support that they were paid hourly, presumably corresponding to hours actually worked. *See* ECF No. 20-7 at 112–24 (showing Per-Visit Nurses' earnings as a multiple of rate by hours); ECF No. 20-8 at 49–50, 52–65, 67–80 (same). However, in a legend titled "ACCO Payment Key Terms," the Per-Visit Nurse rates (Admission, NurseWK1, Nurse WK2, MedWK1, and MedWK2) are listed as "Per Visit Rate[s]" rather than "Hourly Rate[s]." ECF No. 20-9. What is clear to the Court is that Per-Visit Nurses, just as salaried nurses, were paid bi-weekly. *See generally* ECF Nos. 20-4, 20-5, 20-6, 20-7, and 20-8.[8]

---

[8]The payroll records also reveal that ACCO's nurses can be divided into more than simply Per-Visit and salaried nurses. While Defendant breaks the nurses into these categories, and Plaintiff seems to accept that categorization,

If Per-Visit Nurses are included in the calculation, ACCO had fifteen or more employees for twenty-four consecutive weeks in 2020. ECF No. 31 ¶ 27 (citing ECF Nos. 28 ¶ 2; 28-1; 28-2; 20 ¶ 19; 20-3). Conversely, if Per-Visit Nurses are not included in the calculation, ACCO had fifteen or more employees for just five weeks in 2020. ECF No. 30 ¶ 46 (citing ECF Nos. 20 ¶ 20 and 20-3). Under either calculation, ACCO did not have fifteen or more employees for even one week in 2021. ECF No. 30 ¶ 42.

3.  **ANALYSIS**

The sole issue before the Court is whether ACCO is an "employer" as defined in 42 U.S.C. § 2000e(b) and therefore subject to liability under Title VII. A defendant is "subject to Title VII . . . only if, at the time of the alleged [violation], it met the statutory definition of 'employer.'" *Wilson v. Comtrust LLC*, 249 F. Supp. 2d 993, 997 (N.D. Ill. 2003) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 205 (1997)). "The Supreme Court has adopted the 'payroll method' to determine the number of employees that a

---

records show that several nurses who are not designated as Per-Visit Nurses were paid hourly—some even working with the same rate designations (MedWK1 and MedWK2) that supposedly correspond to Per-Visit Nurses. ECF No. 28-1 at 2 ("The Per[-]Visit rates of pay are: Admission, NurseWK1, Nurse WK2, MedWK1, and MedWK2."); *e.g.*, ECF No. 20-7 at 99–101, 126–28; ECF No. 20-8 at 1–12, 16–31. (showing nurses other than Mehriban Mamedova, Brandon Miller, Irina Obidine, and Anna Bayramova—who are the only ones the parties designate as Per-Visit Nurses—working with Per-Visit rates). Indeed, one of Plaintiff's exhibits is an email from Defendant's counsel stating that "more individuals could likely be classified as Per[-]Visit Nurses, but [Defendant] ha[s] included them as regular employees for the sake of th[e pending summary judgment] motion because at times they received regular rates of pay." ECF No. 28-1 at 2. The Court finds it problematic that Defendant appears to have been less than forthcoming about the true categories of its nurses and how ACCO designates them, but because Plaintiff takes no issue with the categories being limited to Per-Visit and salaried nurses, and because there is not adequate evidence or briefing on the matter, the Court will accept the two categories as being all-inclusive for the purposes of this Order.

defendant has under Title VII," which is a test that "looks at the number of employees that were on the employer's payroll during the applicable time period." *Id.* (first quoting then citing *Walters*, 519 U.S. at 207, 211–12). "Plaintiff bears the burden of proving the number of employees, including the duration of their employment, 'with some element of precision.'" *Id.* (quoting *Norman v. Levy*, 767 F. Supp. 1441, 1449 (N.D. Ill. 1991)).

Because Plaintiff alleges that Defendant violated Title VII in 2021, the Court must analyze whether Defendant had sufficient employees "for each working day in each of twenty or more calendar weeks in the current or preceding calendar year"—so here, in either 2020 or 2021. 42 U.S.C. § 2000e(b); *see also Mizwicki v. Helwig*, 196 F.3d 828, 831 (7th Cir. 1999) (requiring that the plaintiff produce evidence "to prove that fifteen or more employees appeared on the employer's payroll for twenty or more calendar weeks in either the year of the alleged violation or the preceding year" (citing *Walters*, 519 U.S. at 206)); *Smith v. Castaways Family Diner*, 453 F.3d 971, 974 (7th Cir. 2006) ("[F]or purposes of § 2000e(b), 'current calendar year' means the year in which the alleged discrimination occurred" (quoting *Komorowski v. Townline Mini-Mart & Rest.*, 162 F.3d 962, 965–66 (7th Cir. 1998))).

The issue here turns on whether certain individuals who performed work on behalf of ACCO, Per-Visit Nurses, should be considered employees and therefore included in the count for the purposes of Title VII or considered independent contractors and therefore excluded. "The ultimate question of whether an individual is an employee or an independent contractor is a 'legal conclusion' which involves 'an application of the law to the facts.'" *E.E.O.C. v. N. Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (quoting *Knight v. United Farm Bureau Mut. Ins.*, 950

F.2d 377, 379 (7th Cir. 1991)). Courts in the Seventh Circuit analyze a set of non-exhaustive "factors to examine the 'economic realities' of a working relationship and to determine whether the worker was an employee for purposes of Title VII." *Wells v. Freeman Co.*, 94 F.4th 608, 614 (7th Cir. 2024), *reh'g denied*, No. 23-1320, 2024 WL 1197929 (7th Cir. Mar. 20, 2024) (quoting *Knight*, 950 F.2d at 378–79 and citing *Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 683 (7th Cir. 2018)). The factors are:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Id.* (quoting *Knight*, 950 F.3d at 378–79). While more lengthy tests and additional factors have been utilized, the Seventh Circuit has concluded that the factors listed in *Knight* subsume the others. *See E.E.O.C*, 154 F.3d at 747 (citing *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 n.1 (7th Cir. 1996)). "[U]nder any version of the test, the most important question is whether the putative employer exercised sufficient control over the plaintiff." *Harris*, 89 F.3d at 683 (citing *Knight*, 950 F.2d at 478 and *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 705 (7th Cir. 2015)). However, there is "no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of relationship must be assessed and weighed with no one factor being decisive." *Geraty v. Village of Antioch*, No. 09 C 6992, 2014 WL 5801440, at *3 (N.D. Ill. Nov. 7, 2014) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)). Further, "[a] plaintiff need not establish

that every *Knight* factor falls in her favor in order to prevail." *Frey v. Coleman*, 903 F.3d 671, 681 (7th Cir. 2018) (citing *Love*, 779 F.3d at 705).

At first glance, the first factor—"the extent of the employer's control and supervision over the worker," *Knight*, 950 F.3d at 378—might appear to weigh in favor of Per-Visit Nurses being independent contractors, because various aspects of their jobs seem to demonstrate autonomy rather than ACCO supervision and control. This includes that the Per-Visit Nurses did not wear uniforms, did not have offices at ACCO and primarily worked outside ACCO headquarters, were not supervised on patient visits, and exercised professional judgment in rendering care. *Bigalke v. Neenah Foundry Co.*, No. 05 C 29, 2006 WL 1663717, at *3 (E.D. Wis. June 9, 2006) ("When a worker typically only spends 2–3 days at the office, and then only for relatively short periods of time, it is difficult to conclude (absent other evidence) that an employee has much control over that individual." (citing *Folkerson v. Circus Circus Enters., Inc.*, No. 93-17158, 1995 WL 608432, at *4 (9th Cir. 1995))); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996) ("The drivers were able to choose to work whatever days they preferred and were free to refuse any assignments they wished. . . . [T]hese facts indicate[] that the manner in which the drivers performed their services . . . was primarily within their own control."); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 816 (6th Cir. 2015) ("A uniform can often be a sign of control, but . . . uniforms were not required . . . ."). This factor is largely rendered neutral, however, because each of these facts was equally true of ACCO's salaried nurses during 2020, whom ACCO admits were employees at that time. *See Wells*, 94 F.4th at 614 n.1 ("[I]f a factor does not aid in distinguishing between employees and independent contractors performing similar work[,] it is less salient." (citing *N. Knox Sch. Corp.*, 154

F.3d at 749)); *c.f. id.* at 616 (holding that because "[the plaintiff] does not identify any ways [the defendant] controlled her more than [other independent contractors] . . . , the supervision and control factor, while often determinative, does little to illuminate [her] status"). Additionally, ACCO's Per-Visit and employee nurses were placed into the same pool for potential patient visits, further demonstrating that they were treated similarly.

There are a select few facts that solely apply to Per-Visit Nurses during 2020 and weigh in favor of Defendant's argument that they were independent contractors. First, the Per-Visit Nurses had complete discretion to accept or reject patient visits, therefore determining their own schedule. *See Ost*, 88 F.3d at 438 (reasoning that the facts that drivers could "work whatever days they preferred and were free to refuse any assignments they wished . . . indicate[d] that the manner in which the drivers performed their services . . . was primarily within their own control"). Second, none of the Per-Visit Nurses worked full-time for ACCO. *C.f. Bigalke*, 2006 WL 1663717, at *3 ("Full time employment is an indici[um] of an employee relationship." (quoting *Folkerson*, 1995 WL 608432, at *4)). Third, the Per-Visit Nurses could—and often did—work for other health care providers in addition to ACCO. *Ost*, 88 F.3dd at 438 ("The drivers . . . could work for dispatching services other than [the defendant employer] . . . [which, inter alia] indicates that the manner in which the drivers performed their services . . . was primarily within their control.").

Other facts, however, support Plaintiff's view that they were employees. These include that the Per-Visit Nurses, just as salaried nurses, submitted their paperwork detailing the care they provided in reports to ACCO supervisors, who would review the reports and require corrections

if mistakes or errors were made. Thus, while the Per-Visit Nurses were not directly supervised while on patient visits, there was an element of supervision and correction to their work by ACCO. *C.f. Moody v. Coliseum Psychiatric Ctr., LLC*, No. 5:04-CV-364 (DF), 2006 WL 1652281, at *7 (M.D. Ga. June 12, 2006) (holding that the nurse plaintiff was an independent contractor where there was "no evidence that the details of [her] work were directly supervised, *monitored*, or controlled by anyone at" the defendant employer (emphasis added)). Additionally, Per-Visit Nurses were required to comply with various ACCO policies, including "ACCO's Personal Protective Equipment (PPE) Policy, Handwashing Policy, [and] Employee Handbook." ECF No. 31 ¶ 3. The policies presumably dictated specific protocols that ACCO nurses were to abide by while performing work for ACCO, which weighs in favor of ACCO treating the Per-Visit Nurses as employees. *See Ost*, 88 F.3d at 439 ("If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831–32 (D.C. Cir. 1979))); *Wells*, 94 F.4th at 614 ("More than simply evaluating the purported employer's control over 'the result to be achieved,' [courts] look at whether the purported employer controlled 'the details by which that result is achieved.'" (quoting *Alexander*, 101 F.3d at 493 (citation and internal quotation marks omitted))).

Certain additional facts are disputed, and thus, cannot be relied upon one way or the other by the Court at this time. This includes whether Per-Visit Nurses were "assigned" versus merely "offer[ed]" certain jobs, and whether they were ever disciplined for refusing jobs or for errors in

their required post-visit paperwork. ECF No. 31 ¶¶ 7, 16; ECF No. 30 ¶¶ 5, 8, 18.

In applying the law to the undisputed facts here, the Court finds that this factor—"the extent of the employer's control and supervision over the worker," *Knight*, 950 F.3d at 378—is neutral, weighing neither in favor of Plaintiff nor Defendant. The most convincing facts to support that the Per-Visit Nurses were independent contractors do little to convince the Court, because those facts were equally true about ACCO's employee, salaried nurses during the same period. *See Wells*, 94 F.4th at 615; *c.f. id.* at 616.

Factor two—"the kind of occupation and nature of skill required, including whether skills are obtained in the work place," *Knight*, 950 F.2d at 378—again does little to assist the Court in its analysis because the relevant undisputed facts applied equally to Per-Visit and salaried nurses during 2020. Both Per-Visit and salaried nurses "received their credentials before applying to provide services for ACCO." ECF No. 30 ¶ 6; ECF No. 31 ¶ 6. This fact does not favor either side, because the mere fact that ACCO's nurses received the credentials for their profession elsewhere does not make them independent contractors. *Moody*, 2006 WL 1652281, at *7 ("[E]mployees are not transformed into independent contractors simply by virtue of their sophisticated training."). Both Per-Visit and salaried nurses also completed annual checklists to confirm that they had completed all nursing competencies. It is unclear from the parties' briefing and proposed facts who trained the nurses annually in their nursing competencies, which renders this fact largely immaterial to the analysis. *Wells*, 94 F.4th at 617 (finding that the second *Knight* factor did "little to differentiate between independent contractors and employees because there [wa]s no evidence that . . . training varied depending on the worker's status" (citing *N. Knox*

*Sch. Corp.*, 154 F.3d at 749 and *Cent. States, Se. & Sw. Areas Pension Fund v. Nagy*, 714 F.3d 545, 552 (7th Cir. 2013))). And while the Per-Visit nurses, just like all ACCO nurses, received their credentials elsewhere, ACCO also clearly provided some guidance on ACCO-specific policies, as the Per-Visit Nurses were required to review and sign "ACCO's Personal Protective Equipment (PPE) Policy, Handwashing Policy, [and] Employee Handbook." ECF No. 31 ¶ 3. This lends support to the Per-Visit Nurses being employees. *See Frey*, 903 F.3d at 680 ("[E]ach employee, including [the plaintiff], received" an employee handbook "which set forth employment policies, benefit program, and other procedures. Consequently, this factor . . . points to [the defendant] as employer"). The Court does not have the benefit of a full record on this point; neither party has laid out what training or protocols ACCO provided to Per-Visit nurses and its other nurses. Regardless, from the record the Court has, factor two seems to slightly favor that Per-Visit Nurses were employees.

Factor three—"responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations," *Knight*, 950 F.2d at 378—weighs in favor of Plaintiff. Once again, Defendants have failed to provide any facts to differentiate the Per-Visit Nurses from the salaried nurses with respect to this factor. Indeed, the only facts pertaining to this factor apply equally to ACCO's Per-Visit and salaried nurses, the latter of which ACCO admits are employees. It is, therefore, of little consequence that Per-Visit Nurses drove their own vehicles to patient visits and provided their own clothing rather than wearing ACCO uniforms, because the same was true for salaried nurses. *See Wells*, 94 F.4th at 615 (citing *N. Knox Sch. Corp.*, 154 F.3d at 749); *c.f. id.* at 616. And it favors Plaintiff that ACCO provided Per-Visit Nurses—and

salaried nurses alike—with "supplies to complete . . . visits such as wound care supplies (gauze, dressings, wound wash solution, bandages, ointment, [and] specialty supplies ordered by the doctor)." ECF No. 31 ¶ 5; *see N. Knox Sch. Corp.*, 154 F.3d at 749–50 (noting that even employees may need to bring their own tools to work).

Factor four—the "method and form of payment and benefits," *Knight*, 950 F.2d at 378–79—is the most informative here, and it weighs decisively in favor of the Per-Visit Nurses being employees. As the Court noted earlier, it is unclear from the record whether Per-Visit Nurses tracked and reported their actual hours and were paid for hours worked visiting patients, or whether they were paid a flat rate for each patient visit regardless of how long it took. *See supra* Section 2. If the Per-Visit Nurses did report their hours and were paid on that basis, it would support Plaintiff's position, because "being paid by the hour is indicative of employee status." *Wells*, 94 F.4th at 616 (citing *Worth v. Tyler*, 276 F.3d 249, 263 (7th Cir. 2001) and Restatement (Second) of Agency § 220, cmt. j (1958)); *Moody*, 2006 WL 1652281, at *8 (noting that the plaintiff "was paid based on the number of hours a week she worked, not on a per-job basis as is typically the case with those individuals the common law has traditionally considered independent contractors").

Even if ACCO's Per-Visit Nurses were paid per visit, they still submitted their timesheets and were correspondingly paid bi-weekly. This supports that they were employees. *Wells*, 94 F.4th at 616 ("Furthermore, there is a crucial difference between submitting an hourly timesheet at regular intervals corresponding to a pay cycle (like an employee might) and submitting an hourly timesheet at the conclusion of a project (like independent contractors would).").

Defendants rightly point out that the fact ACCO provided no employment benefits to its Per-Visit Nurses tends to support that they were independent contractors. ECF No. 18 at 16; *see also Bigalke*, 2006 WL 1663717, at *5 ("[W]hen the employee's health insurance is dependent upon her employment status, the employer's degree of control over the employee can be greatly magnified."). But taken with all the facts here, that ACCO did not provide employment benefits to Per-Visit Nurses is not dispositive. Once again, the salience of this point is lost because ACCO did not provide benefits to any of its part-time employees, so Per-Visit Nurses—who did not work full-time hours—were treated just as any other of ACCO's non-salaried, part-time employees.

"[S]ignificant under [the fourth *Knight*] factor is 'the tax treatment of the hired party.'" *N. Knox Sch. Corp.*, 154 F.3d at 750 (quoting *Darden*, 503 U.S. at 324). Here, this decisively weighs in Plaintiff's favor. ACCO did not provide the Per-Visit Nurses with Form 1099s, which are typical for independent contractors; rather, it issued the Per-Visit Nurses W-2s and treated them as employees for tax purposes and for purposes of unemployment compensation benefits. This factor, therefore, strongly supports that the Per-Visit Nurses were employees in 2020. *See Bigalke*, 2006 WL 1663717, at *5 ("The Form W-2 is used by employers to report wages, tips and other compensation paid to an *employee*. . . . Form 1099-MISC is used to report payments made in the course of a trade or business to another person or business who is not an employee." (emphasis added) (quoting the Internal Revenue Service Frequently Asked Questions)); *c.f. Silic v. BBS Trucking, Inc.*, No. 12 CV 6557, 2014 WL 4783849, at *3 (N.D. Ill. Sept. 24, 2014) (holding that certain employees were independent contractors in part because their compensation was not subject to federal

and state income tax or social security tax); *N. Knox Sch. Corp.*, 154 F.3d at 750 (finding that factor four weighed strongly toward the drivers being independent contractors where "North Knox did not treat [them] as employees for tax purposes or unemployment compensation benefits and did not issue [them] a W–2 . . . . Rather, North Knox issued them Form 1099s, which would be appropriate for independent contractors."). Defendants attempt to minimize this fact by suggesting that the owner of ACCO, Ogbuehi, only used W-2s for the Per-Visit Nurses to avoid "tax complications," ECF No. 18 at 16–17, but this is irrelevant; the tax treatment speaks for itself. *See Bigalke*, 2006 WL 1663717, at *5 ("[T]ax withholding is not simply a matter of bookkeeping, but evidences instead both the employer's longer-term commitment to employing the individual—to process her annual tax obligation—as well as the employer's control over the employee's paycheck." (citing *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 492 (8th Cir. 2003))).

As for factor five—the "length of job commitment and/or expectations," *Knight*, 950 F.2d at 379, the parties did not provide any evidence to support what the expectation was for Per-Visit Nurses upon their hiring.[9] The limited relevant evidence shows that Per-Visit Nurses had discretion to accept or decline work, which could support the presumption that there was no long-term expectation for their continued work. On the other hand, however, Per-Visit Nurses were also issued W-2s and put on

---

[9]In its brief, Defendant claims that when Per-Visit Nurses accepted an offer to work, "the expectation was that the Per[-]Visit Nurses would complete the patient home visit and subsequent paperwork, and nothing more." Defendant provides no citation to evidence for this assertion, however, and the Court can find nothing to support it in the record. Accordingly, the Court will not consider this claim in its analysis.

Page 18 of 20
Case 2:23-cv-01539-JPS   Filed 02/20/25   Page 18 of 20   Document 33

an employee list for whole quarters, which would tend to suggest an implication of a longer-term arrangement. *See Bigalke*, 2006 WL 1663717, at *5. With the limited evidence, the Court will consider this factor to be neutral.

The parties agree that if the Per-Visit Nurses are considered employees, rather than independent contractors, ACCO had 15 or more employees for twenty-four consecutive weeks in 2020. ECF No. 31 ¶ 27 (citing ECF No. 28 ¶ 2, and ECF Nos. 28-1 and 28-2). Because each of the five *Knight* factors is either neutral or weighs in favor of Plaintiff, the Court finds that the Per-Visit Nurses were employees, and thus ACCO falls within the Title VII definition of "employer" and is therefore subject to Title VII liability for events occurring during 2020 and 2021. 42 U.S.C. § 2000e(b); *Wilson*, 249 F. Supp. 2d at 997 (quoting *Walters*, 519 U.S. at 205); *Mizwicki*, 196 F.3d at 831 (citing *Walters*, 519 U.S. at 206). Defendant's motion for summary judgment is therefore denied.

### 4. CONCLUSION

For the reasons explained above, the Court denies Defendant's motion for summary judgment. ECF No. 17. This case will proceed in accordance with the scheduling order entered contemporaneously with this Order.

Accordingly,

**IT IS ORDERED** that Defendant ACCO Management Company LLC's motion for summary judgment, ECF No. 17, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 20th day of February, 2025.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge